# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **L.H., by his parents, D.R. and G.H.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:19-cv-00517** |
| | ) | **Judge Aleta A. Trauger** |
| **TENNESSEE DEPARTMENT OF** | ) | |
| **EDUCATION,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Pending before the court is a Motion to Dismiss filed by the Tennessee Department of Education ("TDOE"). (Docket No. 11.) L.H., by and through his parents, D.R and G.H., has filed a Response (Docket No. 14), and the defendants have filed a Reply (Docket No. 18), to which L.H. has filed a Surreply (Docket No. 21). For the reasons stated herein, TDOE's motion will be granted.

## I. BACKGROUND[1]

### A. The IDEA, Parental Consent, and Private Schooling

The Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, "offers federal funds to States in exchange for a commitment: to furnish a 'free appropriate public education'—more concisely known as a FAPE—to all children with certain physical or intellectual disabilities." *Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743, 748 (2017) (citing 20 U.S.C. §§ 1401(3)(A)(i), 1412(a)(1)(A)). The IDEA "contemplates that such education will be provided where possible in regular public schools, with the child participating as much as possible in the same activities as [non-disabled] children, but the Act also provides for placement in private

---

[1] Except where otherwise indicated, the facts set forth are taken from L.H.'s Complaint (Docket No. 1) and are accepted as true for the purposes of the Motion to Dismiss.

schools at public expense where this is not possible." *Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 369–70 (1985) (citing 20 U.S.C. § 1412(5); 34 C.F.R. §§ 300.132, 300.227, 300.307(b), 300.347)).

Although the IDEA requires a participating state to make a FAPE available to every qualifying child, it also recognizes that the ultimate authority to consent to or reject special education and related services lies with a child's parent or guardian. *See* 20 U.S.C. § 1414(a)(1)(D)(ii). The Act requires that "[a]n agency that is responsible for making a free appropriate public education available to a child with a disability . . . shall seek to obtain informed consent from the parent of such child before providing special education and related services to the child." 20 U.S.C. § 1414(a)(1)(D)(i)(II). "If the parent of such child refuses to consent to services . . . , the local educational agency shall not provide special education and related services to the child" within the IDEA framework, and the agency "shall not be considered to be in violation of the requirement to make available a free appropriate public education to the child." 20 U.S.C. § 1414(a)(1)(D)(ii)(II), (III)(aa).

The question of parental consent becomes more complicated, however, when a child's parents do wish the child to receive services under the IDEA but disagree with school officials about what those services should be or how they should be provided. "The IDEA establishes procedures by which school officials, parents, and the student can collaborate to create" an individualized education program, or "IEP," that takes into account the unique needs of the child. *Long v. Dawson Springs Indep. Sch. Dist.*, 197 F. App'x 427, 432 (6th Cir. 2006) (citing 20 U.S.C. §§ 1401(11), 1414(d); *Town of* Burlington, 471 U.S. at 368). Still, however, members of the "IEP team," as that collaborative group is known, sometimes have irreconcilable differences that the ordinary IEP process cannot resolve. "The IDEA . . . provides for administrative procedures to

resolve disputes when the people involved in the creation of an IEP are not able to agree on its substance." *Id.* (citing 20 U.S.C. § 1415(b)); *see* 20 U.S.C. § 1415(b)(6), (f)–(g), (k). If, at the end of the administrative process, the parties still disagree, then any party can seek review "in any State court of competent jurisdiction or in a district court of the United States." 20 U.S.C. § 1415(i)(2)(A); *see also S.E. v. Grant Cty. Bd. of Educ.*, 544 F.3d 633, 642–43 (6th Cir. 2008).

That administrative/judicial review process, however, takes time, and there is no way to simply pause a child's education and development while his case works its way through an administrative appeal and, if necessary, the courts. The Supreme Court has therefore recognized that a parent who challenges his or her child's IEP may, in the meantime, "unilaterally withdraw their child from [the] public school . . . and put the child in a private school that provides an" IDEA-appropriate education, for which the parent may seek reimbursement from the educational agency as part of its IDEA case. *Florence Cty. Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7, 9 (1993). Parents who make that decision, however, do so "at their own financial risk." *Id.* at 15 (quoting *Town of Burlington.*, 471 U.S. at 373–74). If the courts end up concluding that the parent was mistaken and that the school's chosen course of action would have satisfied the state's IDEA obligations, or if the court concludes that the private school placement itself was inappropriate, then the parent will remain on the hook for the cost of the private education. If, however, the child and his parent prevail on their IDEA claim, then the court can, if appropriate, order that the responsible educational agency or agencies reimburse the parent for the out-of-pocket cost of obtaining an IDEA-appropriate education outside of the public school system. *Id.* at 15–16.

## B. L.H.'s Withdrawal from Public School

L.H. is a ninth grader who lives in Hamilton County, Tennessee. He has Down Syndrome. (Docket No. 1 ¶¶ 1, 7.) According to his Complaint, he "was wrongfully excluded from his

mainstream classroom beginning in the 2012–2013 school year."[2] (*Id.* ¶ 7.) More details of his case can be found in *L.H. v. Hamilton County Department of Education*, 900 F.3d 779 (6th Cir. 2018), which involved claims L.H. brought in the Eastern District of Tennessee.[3] According to that opinion, L.H. was a student at Normal Park Elementary School, a public school operated by the Hamilton County Department of Education ("HCDE"), from 2009 to 2013. *Id.* at 785. While L.H. was at Normal Park, his parents worked with the rest of his IEP team to craft his annual IEPs. *Id.* For L.H.'s first three years at Normal Park, which consisted of kindergarten followed by two years in first grade, L.H. progressed but did not keep pace with his same-grade-level non-disabled peers. *Id.* In May 2012, "some HCDE staff suggested moving L.H. to a Comprehensive Development Classroom (CDC), an isolated class comprising solely special-education students and located at a different school." *Id.* L.H.'s parents resisted the suggestion, and he advanced to second grade, remaining in a general education classroom alongside non-disabled peers. *Id.*

L.H. struggled in second grade, and HCDE intensified its push to move him to the CDC, eventually "insist[ing]" on the placement. *Id.* at 786. L.H.'s parents continued to resist. *Id.* Finally, in May 2013, HCDE finalized an IEP for the coming year that placed L.H. in the CDC over his parents' strenuous objections. *Id.* The Sixth Circuit provides a lengthy discussion of the significant qualitative differences between the education L.H. would receive at the CDC versus the education

---

[2] The IDEA requires that, "[t]o the maximum extent appropriate, children with disabilities . . . [be] educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occur[] only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. § 1412(a)(5). The practice of placing a disabled child in a general education setting alongside non-disabled peers, while supplementing that placement with special education and related services, is known in the special education field as "mainstreaming" or "inclusion." *See L.H. v. Hamilton Cty. Dep't of Educ*, 900 F.3d 779, 794 (6th Cir. 2018).

[3] L.H. refers to this earlier litigation in his Complaint, and it is undisputed that *L.H.* is an account of that litigation.

he would have received at Normal Park. *Id.* at 786–87. Rather than accepting L.H.'s placement in a segregated classroom, his parents withdrew him from Hamilton County public schools and enrolled him in the Montessori School of Chattanooga. *Id.* at 787. They also filed an administrative challenge to L.H.'s IEP, followed by a federal court lawsuit in the Eastern District of Tennessee.

L.H.'s complaint in this prior action apparently originally named both TDOE and HCDE as defendants. TDOE has provided a Settlement Agreement and Release entered into by TDOE and L.H.'s parents in August of 2015. (Docket No. 18-1.) Pursuant to that agreement, TDOE agreed to pay L.H. and his parents $185,000. (*Id.* at 1.) In return, L.H. and his parents agreed that they "forever settle, release, compromise, reach accord and satisfaction, waive, remise, discharge, and acquit DOE . . . on each and every claim that exists as of the effective date of this Agreement, whether known or unknown, or which Plaintiffs at any time hereafter may have against TDOE as of the execution of this Agreement, including but not limited to those claims made or that could have been made" in the Eastern District lawsuit. (*Id.* at 2.)

L.H. and his parents continued to pursue their claims against HCDE. "After years of dispute and litigation"—during which L.H. remained at the Montessori school—the district court held that L.H.'s proposed placement in the CDC violated the IDEA but denied his parents reimbursement for his Montessori tuition. *L.H.*, 900 F.3d at 784 (discussing *L.H. v. Hamilton Cty. Dep't of Educ.*, No. 1:14-CV-00126, 2016 WL 6581235, at *1 (E.D. Tenn. Nov. 4, 2016)). Both parties appealed. The Sixth Circuit rejected various arguments by HCDE that the district court had erred in holding that it had violated the IDEA. *Id.* at 788–96. With regard to the plaintiffs' appeal, the Sixth Circuit acknowledged the rule that

> [p]arents who unilaterally move a child to a private school in response to an unacceptable IEP get reimbursement pursuant to the IDEA only upon a finding that both (1) the public school violated the IDEA and (2) the private school is appropriate under the IDEA. The private school need not meet full public school

IDEA standards, but it must be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." . . . . "[A]t a minimum," the private school must "provide some element of special education services in which the public school placement was deficient"; for example, specific special-education programs, speech or language therapy courses, or tutoring services.

*Id.* at 796 (citing 34 C.F.R. § 300.148; *Florence Cty.*, 510 U.S. at 15; quoting *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 999 (2017); *Berger v. Medina City Sch. Dist.*, 348 F.3d 513, 523 (6th Cir. 2003)). The appellate court concluded that L.H.'s parents had satisfied the requirements for receiving reimbursement. It reversed the district court in that regard and remanded the case. *Id.* at 788–89. On November 11, 2018, the district court ordered HCDE to reimburse L.H.'s parents $103,274.00. *L.H. v. Hamilton Cty. Dep't of Educ.*, No. 1:14-CV-00126, 2018 WL 6069161, at *4 (E.D. Tenn. Nov. 20, 2018).

## C. The Individualized Education Act and L.H.'s Application to Participate

Meanwhile, the Tennessee General Assembly enacted the "Individualized Education Act" ("IEA"), Tenn. Code Ann. §§ 49-10-1401 to -1406, in 2015. The IEA allows the parents of a qualifying disabled child to apply for an "individualized education account," which can be used to pay for tuition at a participating school[4] and related expenses. Tenn. Code Ann. § 49-10-1403(b). A parent who receives an account must, however, sign an agreement promising:

(1) To provide an education for the participating student in at least the subjects of English language arts, mathematics, social studies, and science; and

(2) Not to enroll the parent's eligible student in a public school during participation in the IEA program and to release the [local educational agency] in which the student resides and is zoned to attend from all obligations to educate the student. Participation in the program shall have the same effect as a parental refusal to consent to the receipt of services under 20 U.S.C. § 1414 of the Individuals with Disabilities Education Act (IDEA).

Tenn. Code Ann. § 49-10-1403(a).

---

[4] "'Participating school' means a nonpublic school that meets the requirements established in [the IEA] and seeks to enroll eligible students . . . ." Tenn. Code Ann. § 49-10-1402(6).

In order to qualify for the IEA program, a child must meet the following requirements:

(A) Is a child with any of the following disabilities as defined by the state board of education pursuant to § 49-10-102:

     (i) Autism;
     (ii) Deaf-blindness;
     (iii) Hearing impairments;
     (iv) Intellectual disability;
     (v) Orthopedic impairments;
     (vi) Traumatic brain injury;
     (vii) Visual impairments;
     (viii) Developmental delay; or
     (ix) Multiple disabilities;

(B) Has an active individualized education program (IEP) in accordance with 34 C.F.R § 300 et seq., § 49-10-102, and regulations of the state board of education with one (1) of the disabilities pursuant to subdivision (3)(A) as the primary or secondary disability in effect at the time the department receives the request for participation in the program; and

(C) Meets at least one (1) of the following requirements:

(i) Was previously enrolled in and attended a Tennessee public school for the one (1) full school year immediately preceding the school year in which the student receives an individualized education account (IEA);
(ii) Is enrolling in a Tennessee school for the first time; or
(iii) Received an individualized education account (IEA) in the previous school year . . . .

Tenn. Code Ann. § 49-10-1402(3).

After L.H. obtained his final judgment in the Eastern District of Tennessee litigation, his parents applied on his behalf for an individualized education account under the IEA.[5] (Docket No. 1 ¶ 11.) On February 21, 2019, TDOE denied his application. (*Id.* ¶ 5.) There is no dispute that his disability is sufficient to meet the first requirement of the IEA. TDOE's position, however, is that he does not meet the remaining two requirements. Specifically, he does not have an "active" IEP, as required by Tenn. Code Ann. § 49-10-1402(3)(B). He also cannot satisfy any of the three

---

[5] According to L.H., the Montessori School ends after eighth grade, so his individualized education account would be used for some other private schooling

possible prerequisites under Tenn. Code Ann. § 49-10-1402(3)(C), because he was not enrolled in Tennessee public schools last year, he is not enrolling in a Tennessee school for the first time, and he has never received an IEA before.

L.H. concedes that he does not satisfy the literal requirements for a qualifying child under the IEA, because he has not been enrolled in a Tennessee public school for several years and his education at the Montessori School was not pursuant to an IEP. He argues, however, that he should be treated as compliant with the IEA requirements "by operation of law," because the reason he was not enrolled in Tennessee public schools and did not have an active IEP was that HCDE had violated his IDEA rights and his parents resorted to IDEA-permitted self-help by enrolling him in a private school. (*Id.* ¶ 13 (emphasis omitted).)

L.H. administratively appealed the denial of an individualized education account to the TDOE. TDOE denied the appeal. He then, pursuant to the rules governing IEA appeals, appealed to a state administrative law judge ("ALJ"). On June 10, 2019, the ALJ denied that appeal. (*Id.* ¶ 6.) On June 21, 2019, he filed his Complaint with this court, alleging violations of the IDEA, Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794, Title II of the Americans with Disabilities Act ("Title II"), 42 U.S.C. § 12101 *et seq.*, and the Fourteenth Amendment of the U.S. Constitution. TDOE filed a Motion to Dismiss pursuant to Rule 12(b)(1) and Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Docket No. 11.)

## II. LEGAL STANDARD

### A. Rule 12(b)(1)

"Rule 12(b)(1) motions to dismiss . . . generally come in two varieties: a facial attack or a factual attack." *Genetek Bldg. Prods., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007). When a Rule 12(b)(1) motion contests subject matter jurisdiction factually, the court must

weigh the evidence in order to determine whether it has the power to hear the case, without presuming the challenged allegations in the complaint to be true. *Id.*; *DLX, Inc. v. Kentucky*, 381 F.3d 511, 516 (6th Cir. 2004). When the facts are disputed in this way, "[t]he district court has broad discretion to consider affidavits, documents outside the complaint, and to even conduct a limited evidentiary hearing if necessary," without converting the motion into one for summary judgment. *Cooley v. United States*, 791 F. Supp. 1294, 1298 (E.D. Tenn. 1992), *aff'd sub nom. Myers v. United States*, 17 F.3d 890 (6th Cir. 1994); *see also Genetek*, 491 F.3d at 330. It is then the plaintiff's burden to show that jurisdiction is appropriate. *DLX*, 381 F.3d at 511. If a Rule 12(b)(1) motion challenges subject matter jurisdiction based on the face of the complaint, however, the plaintiff's burden is "not onerous." *Musson Theatrical Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1248 (6th Cir. 1996). A court evaluating this sort of facial attack to the assertion of subject matter jurisdiction must consider the allegations of fact in the complaint to be true and evaluate jurisdiction accordingly. *Genetek*, 491 F.3d at 330; *Jones v. City of Lakeland*, 175 F.3d 410, 413 (6th Cir. 1999).

## B. Rule 12(b)(6)

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The Federal Rules of Civil Procedure require only that the plaintiff provide "a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can

ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679; *Twombly*, 550 U.S. at 556.

## III. ANALYSIS

### A. Waiver of Claims

TDOE argues that L.H.'s claims against it are barred by the August 2015 settlement between TDOE and L.H.'s family. L.H. responds that the parties entered into that agreement years before L.H. applied for funds under the IEA and indeed before the IEA even went into effect. *See* 2015 Tenn.Laws Pub. Ch. 431 (S.B. 27) § 10 (setting January 1, 2016 effective date). They argue that the settlement agreement was not intended to release TDOE from claims that did not yet exist and that, even if the agreement's language could be construed as such, Tennessee and federal law would not permit so broad a release.[6]

---

[6] L.H. does not expressly discuss the settlement agreement in his Complaint, although he does discuss other details of the earlier litigation. This argument, therefore, is not technically one that should have been raised pursuant to a Rule 12(b)(6) motion. L.H. does not, however, dispute the language of the settlement agreement or request the opportunity to provide any other evidence related to the interpretation of that agreement. Because there are no factual issues in dispute, the court will consider this issue now.

The settlement agreement, by its terms, reaches "each and every claim that exists as of the effective date of this Agreement, whether known or unknown, or which Plaintiffs at any time hereafter may have against TDOE *as of the execution of this Agreement*, including but not limited to those claims made or that could have been made" in the Eastern District lawsuit. (Docket No. 18-1 at 2 (emphasis added).) Later in the Agreement, the waiver terms are restated, and the Agreement provides again that "this Agreement forever releases TDOE from any legal action against them for any and all claims made or that could have been made in the Lawsuit up to the date of the execution of this Agreement." (*Id.* at 3.)

L.H. is correct that prospective waivers of later-arising claims in settlement agreements are outright forbidden in some contexts and might at least be disfavored here. *See Logan v. MGM Grand Detroit Casino*, 939 F.3d 824, 829 (6th Cir. 2019) (recognizing that there can be no prospective waiver of Title VII claims); *see also Y.G. v. Riverside Unified Sch. Dist.*, 774 F. Supp. 2d 1055, 1065 (C.D. Cal. 2011) (finding argument that prospective waiver of IDEA rights was void as against public policy "plausible on its face"). The possibility of a prospective, blanket waiver in an IDEA settlement involving a still school-aged child is especially troubling, in light of the fact that state and local educational agencies would otherwise still have ongoing statutory obligations to the child and it is impossible to foresee every issue that might arise in a disabled child's future education. Even if such a waiver were possible, however, the agreement at issue here does not create one. The settlement agreement states, more than once, that it is intended to cover claims arising up to the date of execution. Because L.H.'s IEA-related claims arose later, they are not covered by the agreement. While L.H.'s earlier litigation is certainly a relevant background fact to his current claims—and, indeed, was discussed in the Complaint—the claims themselves are not barred by the language of the settlement agreement.

**B. Exhaustion**

TDOE argues next that L.H.'s claims are barred because he failed to fully exhaust his remedies under the Uniform Administrative Procedures Act ("UAPA"). According to TDOE, L.H. should have appealed to state chancery court and then, if he was unsuccessful there, to the Tennessee Court of Appeals, before filing a claim in this court. TDOE characterizes its argument as jurisdictional in nature. In response, L.H. disputes that any exhaustion requirement that would apply to his claim would be jurisdictional. He argues that, in any event, he has fully exhausted the administrative procedures necessary to bring a claim for violation of his IDEA rights. He points out that, regardless of whether Tennessee offers a concurrent appellate structure for IEA-related claims, the IDEA has its own statutory structure for exhausting special education-related claims, and that structure explicitly allows a plaintiff to choose between state and federal court, rather than being forced to exhaust his claims in one before moving on to the other. *See* 20 U.S.C. § 1415(i)(2)(A).

1. Rule 12(b)(1) vs. Rule 12(b)(6)

The parties' disagreement with regard to whether exhaustion is a jurisdictional issue is, ultimately, beside the point, at least as far as this motion is concerned. TDOE's motion, at least as it pertains to exhaustion, is a facial challenge. The parties agree about what procedural steps L.H. took prior to filing his case in federal court. Those steps are specifically described in his Complaint. TDOE's argument does not rely on any outside facts, nor does the court see how it would need to rely on any outside facts. L.H., moreover, has not argued waiver or any other substantive defense to his alleged failure to exhaust that would hinge on the jurisdictional/non-jurisdictional distinction. The court, therefore, can proceed under the essentially interchangeable standards for Rule 12(b)(1) facial challenges and Rule 12(b)(6) motions.

2. Exhaustion Under the UAPA

TDOE bases its argument on the administrative review provisions of the UAPA and the regulations implementing the IEA. The IEA allows a parent to "appeal a denial of determination of eligibility" through a "two (2) step appeal process":

(a) Step one (1): The appeal shall be on the form provided by the Department and shall be submitted to the commissioner of education within ten (10) business days of receipt of the notice of application denial, suspension, termination, and/or removal. Notice of application denial, suspension, termination, and/or removal shall be provided electronically and via first-class USPS mail and be deemed received three (3) business days after the date of postmark. The appeal shall be reviewed by the commissioner of education, or the commissioner's designee, and a decision shall be issued within forty-five (45) calendar days.

(b) Step two (2): The Account Holder or participating school shall be notified of the commissioner's decision in the step one (1) appeal electronically and via first-class USPS. Such notice shall be deemed received three (3) business days after the date of postmark. An appeal of the commissioner's decision in step one (1) shall be filed with the commissioner by the Account Holder or participating school within thirty calendar (30) days and shall conform to the Uniform Administrative Procedures Act . . . .

Tenn. Comp. R. & Regs. 0520-01-11-.10(1). In other words, after the Commissioner of Education denies an initial appeal, the parent may initiate an ordinary UAPA administrative appeal. A contested case under the UAPA will be heard by an administrative law judge ("ALJ") or hearing officer, either alone or, if so provided, along with members of the relevant agency. Tenn. Code Ann. § 4-5-301. The parties appear to agree, at least for the purposes of this motion, that L.H.'s appeal was heard and rejected by a Tennessee ALJ. (Docket No. 1 ¶ 6.) Under the UAPA, L.H. could then have filed a "petition for review" in state chancery court in order to receive "judicial review" of the ALJ's ruling. Tenn. Code Ann. § 4-5-322(a)–(b). Among the matters that the chancery court could have considered was whether TDOE's decision was "[i]n violation of constitutional or statutory provisions," including whether the agency had correctly interpreted the eligibility criteria of the IEA. Tenn. Code Ann. § 4-5-322(h)(1).

13

TDOE would have this court treat L.H.'s claims as the equivalent of an attempt for judicial review under the UAPA, meaning that, according to TDOE, he would need to file a petition in chancery court and work his way through the state court system before filing a claim in federal court. But as TDOE itself acknowledges, the UAPA "does not authorize federal district courts to review state agency action" *at all*. (Docket No. 12 at 4.) There is not some exhaustion requirement under the UAPA that must be satisfied in order to receive judicial review of the state's determination in federal court. If L.H. were merely seeking judicial review under the UAPA, his resort would be to Tennessee state courts and only Tennessee state courts (unless, for some reason, there was an underlying federal question that would permit an appeal from Tennessee appellate courts to the U.S. Supreme Court). He, however, has not characterized his claims as causes of action for judicial review of administrative action under the UAPA. He characterizes them as arising under the IDEA, ADA, Section 504, and the U.S. Constitution. In other words, TDOE's argument is not based on the exhaustion requirement associated with any claim that L.H. has actually brought.

At the core of TDOE's argument seems to be an assumption that, in order to file *any* federal claim challenging the action of a state agency, one must first exhaust all administrative and state-court avenues for addressing the action. But that is simply not true. For example, "exhaustion of administrative remedies is . . . not required in non-prisoner actions under 42 U.S.C. § 1983." *Mich. Chamber of Commerce v. Land*, 725 F. Supp. 2d 665, 678 (W.D. Mich. 2010) (discussing *Patsy v. Bd. of Regents of State of Fla.*, 457 U.S. 496, 516 (1982)). The IDEA, in contrast, does generally require exhaustion of certain IDEA-mandated state administrative remedies, but it does not require exhaustion of state judicial remedies, instead allowing a plaintiff to choose one court system or the other. 20 U.S.C. § 1415(i)(2)(A). The only caselaw that TDOE has identified in favor of the

particular exhaustion requirement it asserts comes from Tennessee state courts, applying Tennessee law to Tennessee causes of action. (Docket 12 at 4 (citing *Thomas v. State Bd. of Equalization*, 940 S.W.2d 563, 566 (Tenn. 1997); *Tenn. Enamel Mfg. Co. v. Hake*, 194 S.W.2d 468, 470 (Tenn. 1946) *E. Tenn. Pilot's Club, Inc. v. Knox Cty.*, No. E2018-00649-COA-R3-CV, 2019 WL 337022, at *2 (Tenn. Ct. App. Jan. 25, 2019).) However, once a federal cause of action exists for which state sovereign immunity has, if necessary, been abrogated or waived—as it has, for example, under the IDEA, 20 U.S.C. § 1403(a)—then federal law determines what degree of exhaustion, if any, is required. *See Patsy*, 457 U.S. at 502 ("[I]n deciding whether we should . . . require exhaustion of state administrative remedies, we look to congressional intent . . . .").

The court notes, however, that a plaintiff's decision to choose a cause of action with a more favorable exhaustion requirement or a path to the plaintiff's preferred court is not necessarily without costs. The most procedurally advantageous cause of action may not be the cause of action best suited to addressing the rights, injuries, or legal issues that a plaintiff wishes to address. The job of the court, however, is neither to second-guess a plaintiff's substantive pleading decisions nor to deny him the right to avail himself of the cause of action of his choice. The court can only apply both the substantive and the procedural law appropriate to the claims presented.

### 3. Federal Law Regarding Exhaustion of Special Education-Related Claims

The Supreme Court has recognized that a special education case may implicate multiple types of overlapping rights and that the plaintiff, not the court or any educational agency, is "the master of the claim" when it comes to deciding which rights to assert. *Fry*, 137 S. Ct. at 755 (citing *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 & n.7 (1987)). L.H.'s first claim is, on its face, a claim under the IDEA, and the IDEA is unambiguous in providing that "any party aggrieved by the findings and decision made under" an impartial administrative hearing based on an IDEA

complaint "shall have the right to bring a civil action with respect to the complaint presented . . . in any State court of competent jurisdiction *or* in a district court of the United States." 20 U.S.C. § 1415(i)(2)(A) (emphasis added). At least based on all of the information currently available to the court, L.H. availed himself of the full administrative procedures available to him for seeking review of the type of TDOE decision he challenges, the denial of an individualized education account. Under the IDEA, that amount of exhaustion is sufficient to allow a claim to proceed in federal court.[7]

TDOE argues that the denial of L.H.'s request for an individualized educational account is not a violation of the IDEA, but that is a merits question, not a question of how much exhaustion was required. The argument that an IEA violation could give rise to an IDEA claim is, at least, colorable. The IDEA's definition of "FAPE" requires that the special education and related services provided to a disabled child must, among other things, "meet the standards of the State educational agency." 20 U.S.C. § 1401(9)(b). The Sixth Circuit has construed that language as establishing that, "even if a school district complies with federal law, it may still violate the [IDEA] if it fails to satisfy more extensive state protections that may also be in place." *Doe ex rel. Doe v. Bd. of Educ. of Tullahoma City Sch.*, 9 F.3d 455, 457 (6th Cir. 1993) (quoting & citing *Thomas v. Cincinnati Bd. of Educ.*, 918 F.2d 618, 620 (6th Cir. 1990); *David D. v. Dartmouth Sch. Comm.*,

---

[7] TDOE argues that, even if the court holds that only the IDEA exhaustion requirement applies, L.H. has not satisfied that requirement, because he proceeded pursuant to the administrative process for IEA denials, rather than for ordinary IDEA cases. L.H., however, proceeded along the only administrative process available to him for the type of decision he was challenging, pursuant to the very rules on which TDOE relies. Attempting to circumvent that process would have been futile under Tennessee law, and it is well-settled that futility provides an exception to the IDEA exhaustion requirement. *See F.C. v. Tenn. Dep't of Educ.*, 745 F. App'x 605, 608 (6th Cir. 2018). Moreover, whatever route was initially taken, L.H.'s appeal ended up before an ALJ, just as an ordinary IDEA administrative appeal would have. *See* Tenn. Code Ann. § 49-10-606(a).

775 F.2d 411, 417 (1st Cir. 1985); *Geis v. Board of Educ. of Parsippany-Troy Hills*, 774 F.2d 575, 581 (3rd Cir. 1985)).

In Tennessee, for example, a number of federal judges in the Eastern and Middle Districts have held that the Special Education Behavioral Supports Act, a state law that governs the use of restraints and isolation in special education, is incorporated into the definition of FAPE that applies to students in this state. *See P.G. ex rel. R.G. v. Rutherford Cty. Bd. of Educ.*, 313 F. Supp. 3d 891, 900 (M.D. Tenn. 2018) (Crenshaw, C.J.); *I.L. ex rel. Taylor v. Knox Cty. Bd. of Educ.*, 257 F. Supp. 3d 946, 964 (E.D. Tenn. 2017) (Reeves, J.); *J.M. ex rel. Mata v. Tenn. Dep't of Educ.*, 358 F. Supp. 3d 736, 743 (M.D. Tenn. 2018) (Trauger, J.). As this court has reminded TDOE before, Congress's power to assimilate state standards into federal law is well-settled and frequently used. *See, e.g.*, *United States v. Sharpnack*, 355 U.S. 286, 293 (1958) (discussing Assimilative Crimes Act), *discussed in J.M.*, 358 F. Supp. 3d at 745. The IDEA is unambiguously one of those instances where Congress has exercised that power. There is, therefore, nothing unusual about asserting an IDEA claim based on a violation of a state statute. More importantly, nothing about relying on the state statute keeps the IDEA claim from being *an IDEA claim*. L.H. asserts that TDOE violated the IDEA by violating a standard incorporated into the IDEA. That standard happens to have come from state law, but the source of the cause of action is still the IDEA itself. Regardless of whether L.H. is correct in his substantive argument that the IDEA is violated, the IDEA exhaustion provisions apply.

The presence of L.H.'s other federal claims, moreover, does not negate the conclusion that the IDEA exhaustion provisions should govern his case. To the contrary, the IDEA expressly contemplates that other federal claims may overlap with IDEA claims and provides a roadmap for determining when to impose the IDEA exhaustion requirement. Pursuant to 20 U.S.C. § 1415(l),

federal claims "seeking relief that is also available under [the IDEA]" must be "exhausted to the same extent as would be required had the action been brought under this subchapter." 20 U.S.C. § 1415(l). The Supreme Court recently clarified, in *Fry v. Napoleon Community Schools*, how a court should determine if a non-IDEA federal claim "seek[s] relief that is also available under" the IDEA. The Court wrote:

> We first hold that to meet [the § 1415(l)] statutory standard, a suit must seek relief for the denial of a FAPE, because that is the only "relief" the IDEA makes "available." We next conclude that in determining whether a suit indeed "seeks" relief for such a denial, a court should look to the substance, or gravamen, of the plaintiff's complaint.

*Id.* at 752. Under *Fry*, "[w]hat matters is the crux . . . of the plaintiff's complaint, setting aside any attempts at artful pleading." *Id.* at 755. L.H. is a disabled child seeking to receive an education, including special education services, at his preferred school at the public expense. The crux of his claim is a disagreement about his school placement, one of the most common sources of litigation under the IDEA. The presence of L.H.'s non-IDEA federal claims is, therefore, consistent with applying the IDEA exhaustion framework. Because L.H. has availed himself of the full administrative appeal process available to him, he is permitted by the IDEA to proceed to federal court.

## C. Whether an Actionable IDEA Claim Can be Based on a Violation of the IEA

In terms of its substance, the IEA is precisely the type of state law that would typically be held to be incorporated into the IDEA's definition of FAPE. It is directed at providing education and related services to disabled students. Tenn. Code Ann. § 49-10-1402(3)(A). Indeed, it is specifically targeted at students with preexisting IEPs—that is, students covered by the IDEA. Tenn. Code Ann. § 49-10-1402(3)(B). It is administered pursuant to standards of the state educational agency, TDOE. *See* Tenn. Comp. R. & Regs. §§ 0520-01-11-.01 to -.11. It addresses

18

issues that are also central under the IDEA, such as inclusion of disabled students in general education classrooms alongside non-disabled students. Tenn. Code Ann. § 49-10-1403(d); Tenn. Comp. R. & Regs. § 0520-01-11-.08(1). Based on subject matter alone, the court would have no problem concluding that the rights secured by the IEA are incorporated into the definition of FAPE.

The only potential complication is that, in order to "qualify to participate in the program," parents must file an agreement accepting that "[p]articipation in the program shall have the same effect as a parental refusal to consent to the receipt of services under 20 U.S.C. § 1414 of the" IDEA. Tenn. Code Ann. § 49-10-1403(a)(2). As written, therefore, the IEA envisions that, once a child is successfully enrolled in the program, the child, typically through his parents, will have voluntarily withdrawn from the IDEA framework, which the IDEA permits the parent to do. If L.H. were already an IEA student, then, that might be enough to end the court's inquiry—his parents could not avail themselves of a legal structure that they voluntarily exited.

L.H., however, is not an IEA student, and his claim is not about how Tennessee treats students after they have enrolled in the IEA program and voluntarily refused a FAPE under the IDEA framework. L.H. complains of how TDOE has handled its IEA selection and application process, and the provisions governing that process reach IDEA-eligible students who have not yet voluntarily withdrawn from the IDEA structure. It is at least possible, then, that a violation of the pre-denial-of-consent provisions of the IEA could give rise to an IDEA claim.

That said, any such claim would have to be premised on more than just a bare violation of the IEA, because the IDEA does not treat every legal violation as actionable. The IDEA, admittedly, allows a court to grant relief based on both substantive and procedural violations of the Act. *Deal v. Hamilton Cty. Bd. of Educ.*, 392 F.3d 840, 853 (6th Cir. 2004). In order to justify relief, however, a procedural violation must be one that "impeded the child's right to a free

appropriate public education," "significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education," or "caused a deprivation of educational benefits." 20 U.S.C. § 1415(f)(3)(E)(ii). For a substantive violation to permit relief, that relief must be "based on a determination of whether the child received a free appropriate public education." 20 U.S.C. § 1415(f)(3)(E)(i). In other words, even if (1) the IDEA incorporates IEA standards for children whose parents have not yet withdrawn them from the IDEA and (2) a plaintiff can show that some such provision was violated, a cause of action will only exist if the error resulted in one of the aforementioned types of deprivation.

The only injury that L.H. asserts is that he was not permitted to participate in the IEA program.[8] Such a denial, however, categorically cannot be construed as a denial of FAPE or an interference in FAPE, because participation in the IEA program is not a FAPE. To the contrary, participation in the IEA program means forswearing one's right to a FAPE. If anything, a denial of FAPE would occur if a child were improperly included in the IEA program, not excluded. Similarly, L.H. has failed to allege any way in which TDOE's decision significantly impeded his parents' opportunity to participate in the decisionmaking process regarding the provision of his FAPE. The only possible ground for relief, then, would be that the exclusion of L.H. from the IEA was a procedural violation that "caused a deprivation of educational benefits." 20 U.S.C. § 1415(f)(3)(E)(ii). Whatever the term "educational benefits" might be read to mean in a vacuum, however, participation in the IEA would not provide an educational benefit for IDEA purposes, because participation would involve a waiver of IDEA rights. Although TDOE, in its briefing, characterizes the IDEA cause of action as narrower than it is, L.H. has not identified any caselaw

---

[8] L.H. also seeks to tie his claim to his IDEA "stay-put" rights, which entitle a child to maintain his current placement while IDEA litigation takes place. *See* 20 U.S.C. § 1415(j); 34 C.F.R. § 300.518. L.H.'s parents, however, did not avail themselves of those rights, and, in any event, L.H.'s stay-put rights expired when the Eastern District litigation ended.

that would support allowing him to use the IDEA cause of action to vindicate any substantive right other than one found in or incorporated into the IDEA. Because exclusion from the IEA does not result in the deprivation of or interference with any substantive IDEA right, the IDEA provides no cause of action.

However, the court notes that, although L.H. has not qualified for the IEA program, it may still be possible that he is entitled to a publicly funded private education. As with any student, he is entitled to publicly supported placement in a privately operated program, if the available "regular public schools" are incapable of providing him with the FAPE to which he is entitled under the IDEA. *Town of Burlington*, 471 U.S. at 369–70 (citing 20 U.S.C. § 1412(5); 34 CFR §§ 300.132, 300.227, 300.307(b), 300.347)). That would be the case, even if the IEA had never been enacted. His allegation that he was denied entrance into the IEA program does not, however, state an actionable IDEA violation, in and of itself.

## D. Fourteenth Amendment Claim

In his Complaint, L.H. claims that he is alleging a violation of the Fourteenth Amendment "and/or" the ADA. (Docket No. 1 § 23.) TDOE argues, correctly, that the Fourteenth Amendment does not create a cause of action.[9] In L.H.'s Response, he seemingly concedes that he has mentioned the Fourteenth Amendment only in the context of its relationship to Title II of the ADA, in order to fully avail himself of the abrogation of sovereign immunity found in *United States v. Georgia*, 546 U.S. 151, 159 (2006). Because the parties appear to agree that L.H. is not pursuing a stand-alone Fourteenth Amendment claim, the court will evaluate this aspect of his Complaint in the context of the ADA.

---

[9] TDOE also argues that L.H.'s claim would fail pursuant to 42 U.S.C. § 1983, the most common statutory source for a constitutional claim, because it is barred by the state's sovereign immunity. Because L.H. does not pursue his claim under § 1983, the court will not address this aspect of TDOE's argument.

**E. Section 504 and ADA Claims**

TDOE argues that L.H.'s Section 504 claim and ADA claim should be dismissed because he does not allege that he was denied admission into the IEA program on the basis of his disability. The ADA prohibits "discrimination against persons with disabilities in three major areas of public life: employment, which is covered by Title I of the statute; public services, programs, and activities, which are the subject of Title II; and public accommodations, which are covered by Title III." *Tennessee v. Lane*, 541 U.S. 509, 516–17 (2004). To prove a violation of Title II, the plaintiff must show: "[1] that he is a 'qualified individual with a disability,' [2] that he was denied 'the benefits of the services, programs, or activities of a public entity' or otherwise subjected to discrimination by such an entity, and [3] that the denial or discrimination was 'by reason of' his disability." *Love v. Westville Corr. Ctr.*, 103 F.3d 558, 560 (7th Cir. 1996) (quoting 42 U.S.C. § 12132). "The language of Section 504 of the Rehabilitation Act is nearly identical to Title II of the ADA," at least in the respects relevant to this motion. *Jaegly v. Lucas Cty. Bd. of Comm'rs*, No. 16-CV-1982, 2017 WL 6042237, at *4 (N.D. Ohio Dec. 6, 2017) (citing *Key v. Grayson*, 179 F.3d 996, 997 (6th Cir. 1999)). TDOE argues that L.H. was rejected from the IEA program because he failed to meet its requirements with regard to his current educational placement and lack of an active IEP, not because of his disability, and these claims, therefore, should be dismissed.

L.H. does not dispute that his denial was based on his failure to satisfy the literal requirements of the IEA, as interpreted by TDOE. He argues, rather, that the reason he failed to meet those requirements was that he was "*forced* out of public school" when HCDE first failed to continue providing him with a placement in a general education classroom. (Docket No. 14 at 19.) He argues that, by denying him participation in the IEA, TDOE was "refusing to take into account this past discrimination," which was "itself discrimination." (*Id.*) L.H. does not cite to any caselaw

embracing his theory of liability in a comparable case, relying instead on citation to general principles of antidiscrimination law that provide the court limited guidance with regard to the viability of his claims.

What L.H. is arguing, in essence, is that HCDE's earlier denial of his FAPE, which caused his parents to remove him from a public school, entitles him to continued placement in private school pursuant to the IEA. That original violation of the IDEA was, however, fully addressed in the Eastern District litigation. L.H. settled his claims against TDOE and received injunctive relief against HCDE from that district court. This court has no power to order an additional remedy in response to an injury that has already been the subject of litigation. All the court can consider is the alleged violation at issue here. L.H. has alleged that he applied for an individualized educational account, despite being a private school student who did not have an IEP. As such, he was not entitled to participate in the IEA program by its own terms. Nothing in L.H.'s Complaint, moreover, suggests that TDOE's reason was merely a pretext for discriminating against him based on his disability. To the contrary, the IEA is a program specifically for students with disabilities like his, and denying L.H. participation in the program appears to have been the result of a straightforward, or at least colorable, application of the program's terms. Moreover, even if TDOE is wrong, as a matter of Tennessee law, in its interpretation of the IEA, that misinterpretation would not be a ground for liability under federal antidiscrimination laws. Insofar as L.H. wished to challenge the state-law statutory interpretation performed by the ALJ, the appropriate avenue was a petition for judicial review in chancery court. Tenn. Code Ann. § 4-5-322(h)(1) (allowing judicial review for statutory errors).

L.H. argues next that the court should hold that he is entitled to an exception to the ordinary requirements of the IEA as a reasonable accommodation of his disability. Title II's implementing

regulations provide that "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the services, program, or activity." 28 C.F.R. § 35.130(b)(7); *see also Roell v. Hamilton Cty., Ohio/Hamilton Cty. Bd. of Cty. Comm'rs*, 870 F.3d 471, 488 (6th Cir. 2017) (citing *Ability Ctr. of Greater Toledo v. City of Sandusky*, 385 F.3d 901, 907 (6th Cir. 2004)) (acknowledging that Title II liability can be premised on a failure to offer reasonable accommodations). L.H. argues that the only reason he cannot meet the requirements of the IEA is his disability, which resulted in his parents' withdrawing him from public school. Allowing an exception to the IEA's eligibility requirements for him, he argues, would be a reasonable accommodation of that disability.

What L.H. is seeking, however, is not merely an accommodation for his disability, but an accommodation for his lack of an active IEP. That lack of an active IEP was not the result of any particular physical or mental limitation but, rather, like his withdrawal from public school, was a result of the breakdown of the IDEA process when L.H. was at Normal Park. The failures of the IEP process at Normal Park, however, have already been addressed in L.H.'s prior litigation, and L.H. has already received both judicially awarded remedies from HCDE and a settlement from TDOE.[10] Forcing TDOE to make an exception to the IEP requirement under the IEA would be, in effect, a supplemental remedy for his earlier, already-addressed injuries—an additional form of relief beyond what he was awarded in the underlying Eastern District litigation.

---

[10] Insofar as L.H. objects to the court's acknowledgment of the settlement agreement with regard to this issue, the court notes that the details of the settlement are immaterial to the court's analysis. What matters is that any claims against TDOE based on his withdrawal from Normal Park are distinct from the TDOE decision at issue in this case and were, or could have been, addressed in the earlier litigation discussed in his Complaint.

The IDEA permits a court crafting a remedy for an IDEA claim to "grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii). For example, L.H. could have (and may well have) asked the Eastern District to order HCDE to pay for L.H.'s continuing placement in private school under the IDEA, under the theory that his preferred private school was the only possible IDEA-appropriate placement for him. Moreover, if L.H. had not settled his claim against TDOE on the terms he did and at the time he did, he could have demanded inclusion in the IEA program and an equitable waiver of some of the program's requirements as part of the resolution of his claims.[11] L.H. complains that, when he settled his earlier claims against TDOE, the IEA was not yet in effect. But it is entirely commonplace for a plaintiff to settle a claim only to learn, from subsequent events, that the claim may have been more valuable than he believed or that, in light of the new events, he would have preferred to settle on different terms. That is simply part of the risk that one bears when settling a lawsuit.

L.H. was denied participation in the IEA program because, among other things, he did not have an IEP from 2013 through 2019. That lack of an IEP was the subject of separate litigation and separate remedies granted by this court's sister court. The court has no basis under the IDEA, ADA, or Section 504 to intercede and grant L.H. an additional remedy for an injury that was already addressed in previous litigation. His claims therefore will be dismissed.[12]

---

[11] This court offers no opinion on whether such remedies would have been appropriate in the Eastern District case.

[12] The court notes, again, that L.H. is still, at least based on the information before the court, a disabled Tennessee student and still, therefore, a student to whom the state owes a FAPE. TDOE has not identified any basis for concluding that his parents' earlier use of private schooling as self-help during litigation relieves the state of its IDEA obligations now. If L.H. seeks and is denied a FAPE, or if he suffers an actionable procedural violation under the IDEA, he will have a new cause of action.

## IV. CONCLUSION

For the foregoing reasons, the Motion to Dismiss filed by TDOE (Docket No. 11) will be granted and L.H.'s claims will be dismissed.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge